Carr, J.
In the construction of wills, we are to find out the meaning, the intention, the will, of the testator; and unless that violates some principle of law, it must be carried into execution. To my mind it is just as clear as any form of words could make it, that this testator wished, that all h*is slaves should be given up to Dissosway, to be transported to Liberia, there to be free, if the colonization society would pay the expenses of removal; unless any of them should prefer to stay here and be slaves—and such (he willed) should be the slaves of his brother, the appellant. I do not. believe he had an idea of making their election within twelve months, a condition, which, under all circumstances, should be strictly performed, and on failure of which they should be the slaves of his brother. He thought it probable, I suppose, that the choice would be submitted to them within the twelve months; and meant, that all who, upon such submission, should express a preference for remaining, should thereupon be handed over to his brother. The executor has explained this matter fully. He certainly had, for the creditors, the paramount right of assenting or not to this bequest, and of saying when he could with safety assent. He tells us, that he found the state of the debts such, that he could not discharge them without selling some of the negroes, or hiring them out. He very properly preferred the latter; and this making delay inevitable, he did not think it proper to submit' to them, at once, the question of election. In the meantime, the appellant filed this bill—and then the subject being before the court, the chancellor very properly *257 ■appointed commissioners to examine the negroes. Those commissioners have reported, that all but one have elected to go to Liberia; that two of them were too young (one being six and the other two years old) to make a choice; and that in these cases, they had taken the choice of their mothers. In this, I think, they acted very properly. It is certain, that the testator did not, on account of their infancy, intend to condemn them to unconditional slavery; and who so proper to decide for them as their mother?
It was said, that the children born since the testator’s death must be slaves, because their mothers were so at their birth. But admitting the fact, the consequence does not seem to follow: for the testator wills, that all the rest of his slaves shall be given to Dissosway, to be taken to Liberia. Now, if these children were born slaves, they were the slaves of the testator, and come within the bequest as well as their mothers. It is not worth while then to inquire whether they were born free or not.
It was also said, there is no evidence of the willingness or the ability of the society, to pay the expense of transportation. I think there is such evidence of willingness as justifies the decree; and as to the ability, the testator required no guaranty for that.
With respect to the hires, I do not think that a question before us. This is an appeal from an interlocutory decree, and in such cases, we have often said, that the appeal is only from what the chancellor has done, not from such parts of the case as he has not yet acted upon—as to these, when the cause goes back, he may make such decree as all parties will be satisfied with. At any rate, he has as yet done nothing with respect to the profits, which can be appealed from.
It is objected by the appellee’s counsel, that the chancellor ought not to have required that Dissosway should give bond to refund, if debts should afterwards come against the estate. I had thought, at first, that this point was not before us, as the appeal was taken by the other party ; but, upon *258 reflection, I think we ought to take notice of it; for it is a ... .... . ... requisition which vitally affects the negroes, since the failure to give the bond, would -frustrate the intention of the testator as to their freedom, and they being no parties to this proceeding, could not appeal from it; nor could their trustee do so, as he has never been before the court; and the executor would not appeal from it, for it is in his favor. It seems incumbent on us, therefore, to see whether the decree is right in this respect.
When a testator wills freedom to his slaves, it is, a general rule, clearly not in the executor’s power to demand a refunding bond: for who is to give it? Nobody; and thus the will might always be frustrated. The law shews that this is so, by giving to the creditors a resort to the slaves themselves, in case of defect of assets. The executor, too, if he finds the existing state of the debts demands it, may retain them, and hire them out, till he has raised a sufficient fund to pay the debts; and this, more especially in the case before us, where they are by the directions of the will to be removed beyond the reach of after claims. But even here, I do not think he can demand, or the court direct, that Dissosway shall give a refunding bond. The testator as he never meant to give Dissosway any beneficiary interest in the slaves, as little intended to subject him to any loss or risk; and, if he had so intended, could impose on him.no such obligation. The direction, then, that the slaves shall be given to Dissosway, to be sent to Liberia, gives no more right to the executor to demand security, than if they had been set free at once. And of this the executor seems fully sensible; for in his answer, he says, that while his anxious desire to further the benevolent intentions of his testator, and bis conviction that no one would give the usual refunding bond, if he let the slaves go to Africa, induced him to determine to dispense with that bond, from those who should go thither, yet ordinary prudence forbade his doing so, at least until all the claims that he had notice of against the estate, were settled. Accordingly, he has hired them out. *259 until we find, that, after paying the demands against the estate, he had at the last settlement, which was brought down to the 31st December 1830, a balance of 449 dollars in his hands ; and there being two years hires of the negroes since, he must have now upwards of 1000 dollars, beyond all 1mown claims on the estate. In this state of things, it was clearly wrong, I think, to put it in his power to demand of Dissosvjay an indemnifying bond in the penalty of 4000 dollars. This would, in all probability, wholly defeat the will. While the fund now in his hands, shall remain with the executor, it surely furnishes ample security against outstanding debts; and when, upon a final hearing, it shall be disposed of, as it probably will be according to the principles established in Paup v. Mingo, (ante, p. 1G3.) the court will not suffer it to be taken from him, without requiring of the person to whom it shall be decreed, bond and security to refund. I think, then, so much of the decree as requires this bond of Dissosway, if the executor chooses to demand it, is wrong, and should be corrected.
It was urged, that we ought now to take precautions, and make provisions insuring the due execution of that part of the will, which looks to the transporting these persons to Liberia; that we ought to require bond and surety for carrying them, or to pronounce that unless transported within a reasonable time, they should be given up to the appellant as his property. I do not think we are called on, at this time, to take any such step. It would be premature, and might operate injuriously and unjustly. We cannot possibly foresee, what circumstances may occur, or how they may influence, the question hereafter. All that we can safely do now, is to direct the circuit court, to which we shall send back this interlocutory decree, to reserve to the parties, liberty to resort to the court for its further aid, if at any future time such aid, in their opinion, shall become necessary for the due execution of the testator’s will. Under such leave, if the appellant shall find that the transportation of the negroes is not likely to take place, or is unreasonably *260 delayed, he may bring the subject before the court, and that which cannot now be foreseen, may then be decided, upon the actual circumstances of the case.